IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 06-cv-01685-MSK-KLM

AHITHOPHEL TURNER,

      Plaintiff,

v.

JOHN E. POTTER, Postmaster General, U.S. Postal Service,

      Defendant.

---

## ORDER ON MOTION FOR SUMMARY JUDGMENT

---

THIS MATTER comes before the Court on the Defendant's Motion for Summary Judgment **(#22)** and supporting brief **(#23),** to which the Plaintiff responded **(#27, #28)** and the Defendant replied **(#29).** Having considered the same, the Court finds and concludes as follows.

## I. Jurisdiction

The Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## II. Issue Presented

The Plaintiff, Ahithophel Turner, asserts claims of discrimination against the Defendant, John E. Potter, in his capacity as Postmaster General of the United States Postal Service. Mr. Turner asserts a variety of claims under Title VII of the Civil Rights Act of 1964 and the Rehabilitation Act of 1973, but they can best be summarized as follows:

(1)    The Postal Service subjected Mr. Turner to disparate treatment either because he is disabled, African-American, or Muslim. The disparate treatment consisted of: (a) a failure to promote Mr. Turner; and (b) a failure to provide training opportunities to Mr. Turner.

(2)     The Postal Service retaliated against Mr. Turner because he assisted another individual with an EEO complaint, and because he filed EEO complaints of his own.  The adverse actions were: (a) the failure to promote Mr. Turner; and (b) the termination of Mr. Turner's temporary assignment as acting supervisor at the General Mail Facility and his concomitant reassignment to the Bulk Mail Facility.

(3)     The Postal Service subjected Mr. Turner to a hostile work environment because of his disability, race and/or religion.

(4)     The Postal Service failed to accommodate Mr. Turner's disability by denying his request for provision of a safety harness, and denying him training on the riding equipment.

(5)     The Postal Service failed to accommodate Mr. Turner's religion by disallowing him from attending religious services and prayers.

The issue presented is whether a trial is required on any of Mr. Turner's claims.

## III.  Material Facts

Based upon the evidence submitted and construed most favorably to Mr. Turner, for purposes of this motion, only, the Court finds the following.

Mr. Turner is an African-American, Muslim veteran, who was hired[1] as a probationary custodial employee of the Postal Service at the Denver Bulk Mail Center on May 15, 2004.  His probationary period with the Postal Service lasted 90 days.

Mr. Turner contends that he is disabled based upon a Department of Veterans Affairs written decision stating that Mr. Turner has knee and shoulder injuries related to his military service.  It described his right knee as "30% from 12/01/2001", and his right shoulder as "30% from 07/09/2004".  According to Mr. Turner, these percentages are disability ratings.  However, no physician has imposed any restrictions on Mr. Turner's activities.

---

[1] Mr. Turner was hired by the Postal Service under the Veteran Direct Hire program.

These injuries sometimes prevent Mr. Turner from throwing a football, and they make it troublesome for him to climb stairs. Sometimes his knees "flare up" and prevent him from going to work. At his deposition, when asked to describe what major life activities are limited by his injuries, he responded: "It takes away the activity of me playing football, I can't play basketball, can't do too much running and jumping, I can't stand too long, can't buy a home with stairs, I can't get on my knees and play with my daughter, can't change my own flat tire." Mr. Turner has also stated that his injuries "impair [his] ability to stand, sit a period of time, walk, lift, reach, push, pull, twist, turn, squat, climb." Mr. Turner reported that he can sleep only 2 hours at a time and awakens several times per night "due to pain, restlessness and stress."

During Mr. Turner's probationary period, his supervisor was Roland White. While supervised by Mr. White, several pertinent events occurred. From May through August 2004, Mr. Turner "represented" a black, disabled co-worker, Ezekiel Williams, with an EEO complaint.[2] Mr. White requested that Mr. Turner be "removed" because he did not like his character. Because Mr. White did not have authority to fire Mr. Turner, his recommendation was forwarded to Mr. White's supervisor, Garlin Wiggans. Mr. Wiggans declined the recommendation because Mr. White's personal opinion of Mr. Turner did not constitute sufficient grounds to remove him. Mr. White made disparaging comments about disabled, African-American veteran employees. In May 2004, he told disabled veteran William Arnold that "the African-Americans and disabled

---

[2] The exact nature of this "representation" is not evident in the record. Indeed, much of the evidence in the record is imprecise. The Court has combed the record to determine what happened and when. In many instances, the events are not well-described, and date of such events is either not specified at all or is referred to generally. The Court has attempted to glean all pertinent facts from the record. Where the evidence is scanty, the Court has drawn all possible inferences in favor of Mr. Turner.

veterans would never get any promoted."[3]  In July 2004, Mr. White told Mr. Arnold that "he was

sick of disabled veterans whining and filing complaints against management" and that "we should

be happy we have jobs and, if it was up to him, he would fire all of us."  During either August or

September 2004, he told Mr. Turner and others "that he wanted to fire all disabled veterans".

Mr. White apparently made similar comments at other times, but the dates are not clear

from the record.  Mr. White said that if he had it his way, he would fire all of the disabled veterans

and hire cheap labor,[4] that some individuals were prevented from using PAR (Preferred

Assignment Register) sheets to request lateral assignments because they were disabled veterans,[5]

and that Mr. Turner is a trouble maker due to his race.

When Mr. Turner's probationary period ended, Mr. DiNofrio became Mr. Turner's

supervisor.  It appears that Mr. White discussed at least one disparaging comment with Mr.

DiNofrio.

Mr. Turner was initially hired at a Grade 3 level of pay.  In order to be promoted to Grade

4, Mr. Turner needed training in driving particular equipment and a license.[6]  During Mr. Turner's

---

[3] During his deposition, Mr. White denied making this and any similar statement.  However, at this juncture, the Court is compelled to construe conflicting evidence in Mr. Turner's favor.

[4] It is not clear whether this is the same as, or separate from, the comment made during Mr. Turner's probationary period.  For purposes of this ruling, the Court assumes there were two separate comments.

[5] This last statement comes from one of Mr. Turner's affidavits, and is ambiguous.  It is not clear whether Mr. White made such statement to explain his belief as to why some workers had been denied PAR sheets, whether it was his expression as to why he was denying a PAR sheet to particular workers, or whether it was simply an observation he had made as to the facts.

[6] It is not clear from the record what type of training or license was required.  The affidavit of Wayne Ortiz, the Postal Service's Driver Instructor/Examiner, equated driver training with classroom instruction, and drew a distinction between driver training and "hands-on training for operating powered industrial equipment."  It is not clear what types of equipment required driver training, but the evidence

probationary period, Mr. White denied him, but not caucasian co-workers, training on the driving equipment. According to Mr. White, he denied training to Mr. Turner because he did not think that Mr. Turner was "a retainable employee."

After his probationary period ended, Mr. Turner received training in November 2004 on the Walking Forklift, the Big Joe, and the Walking Erect Pallet Jack, but received no training on the riding equipment. He was scheduled for driver training[7] on November 12, 2004, but Bob Padilla[8] took him out of training because they were short of people that day. Thereafter, Mr. Turner received no training on the riding forklifts, even though other custodians received such training. Since November 5, 2004, Mr. Turner has had a license to drive inside the postal facility, but so long as he worked as a custodian he did not receive Grade 4 pay because such assignment did not include driving duties.

In June 2004, approximately one month into his probationary period, Mr. Turner applied for a promotion to a Grade 5 or 6 MOS clerk job. To become eligible for this type of promotion, an employee at the Bulk Mail Center was required to take a test and fill out specific paperwork called a KSA form (short for knowledge, skills and abilities). The KSA form required the applicant to describe his or her skills in multiple categories. A committee reviewed each KSA and subjectively assigned each skill and experience a numeric value between 1 and 5, based upon the

shows that class instruction was available for a broad variety of equipment, including forklifts, tow tractors, snow blowers, sweepers, and more. It also appears that there was a distinction between "walking" equipment and "riding" equipment. Again, the evidence as to these distinctions is not entirely clear.

[7] It is not clear whether such training pertained to "riding" equipment, as opposed to "walking" equipment.

[8] There is no evidence as to who Bob Padilla is or what authority he held.

quality of the description provided by the applicant. According to Mr. DiNofrio, a score of 3 in any of the categories is average; a score of higher than 3 in any category is rare. The scores from each category were tallied, divided by the number of categories, multiplied by 20, then added to a clerical examination score. The result was divided by 2 for a final score. After the employee received a final score, his or her name was then placed on a ranked eligibility list. The employee with the highest final score was ranked in first position, followed in descending order by qualified employees with lower scores. When a vacancy occurred, the employee who was ranked in first position was automatically to be offered the job. If the employee declined the job, it was to be offered to the next employee on the list. Pursuant to a collective bargaining agreement, all vacancies were required to be posted within 30 days unless the union was provided with a written explanation.

Mr. DiNofrio was on the committee which scored Mr. Turner's KSA. Mr. Turner's final score was 67.[9] This made Mr. Turner the top scoring person listed as eligible for an MOS clerk job from September 7 to October 21, 2004.[10]

A Grade 5 MOS clerk job became vacant at the beginning of October 2004, but it was not posted. Had the job been posted when it became available, it would have been offered to Mr.

---

[9] On his KSA, Mr. Turner received a score of 3 out of 5 for knowledge of computer systems, notwithstanding his bachelor's degree in information technology. With his KSA, he attached "proof" of his computer experience – a document containing an extensive list of computer course work. He also received a score of 2 out of 5 for "ordering", notwithstanding experience in the military with work orders and his near completion of a master's degree in business administration with an emphasis in logistics and supply chain management.

[10] Mr. Turner stated in his affidavit that his name was placed on the list in 2004. Mr. DiNofrio stated in his affidavit that Mr. Turner's name was placed on the list in 2005, rather than 2004. Given Mr. DiNofrio's deposition testimony, this appears to be a typographical error.

Turner as the top ranked person on the eligibility list. The decision not to post the job was made by Steve Gillespie, who oversaw and maintained the information systems at the Bulk Mail Center. The reason he gave for delaying the posting was that the job was going to be reevaluated in light of workload considerations. Mr. Gillespie stated in his affidavit that he was not asked by any management official to delay posting the job for purposes of denying the job to Mr. Turner, for purposes of adding names to the eligibility list, or for any reason other than to review the operational issues. This statement is ambiguous – it can be interpreted either as a statement that Mr. Gillespie was not directed to delay posting by any management official or that he was so directed, but only for the purpose of reviewing operational issues. With two possible interpretations, the Court considers the one most favorable to the non-movant, in this case, Mr. Turner.

The job was posted at some time after Mr. Turner ceased to be the top person on the eligibility list, but it is not clear from the record when the job was posted or when other people surpassed Mr. Turner on the list. A list printed December 13, 2004, contains the names of four people and ranked Mr. Turner third behind Dan Trujillo and Sarah Hulick.[11]

The job was first given to Mr. Trujillo. He worked in the job for a week and a half, and was removed from the job. In January 2005, the job was given to Ms. Hulick, a white employee. On her KSA, Ms. Hulick had scored 4 in almost every category, including knowledge of

---

[11] Ms. Hulick's name was added to the list on October 22, 2004. Mr. DiNofrio stated in his affidavit that this occurred on October 22, 2005, but such statement was immediately followed by his observation that the next MOS clerk job posting was in January 2005, and the job was offered to Ms. Hulick. Thus, the Court treats this as another typographical error.

computer systems and "ordering".[12]  Her final score was 78.25.

On January 28, 2005, Mr. Turner filed an EEO complaint alleging discrimination (the first EEO complaint).  Mr. Turner alleged that he was discriminated against when he was denied training for driving equipment on November 12, 2004, and when he was not selected for the MOS clerk job on an unspecified date.

In March 2005, Mr. Turner was given a temporary Grade 5 MOS clerk job.  After about one month, he was sent back to his prior custodial job at Grade 3 pay.  The Grade 5 MOS clerk job that he vacated was then given to another African-American, but non-Muslim employee, Betty Reddix, who had not completed the KSA paperwork.  She later completed a KSA, and received a score of 4 in 4 categories.  Her "final rating" was 70.8.

Either in late spring or early summer of 2005, Mr. Turner was given a temporary assignment working as an acting supervisor at the General Mail Facility.  Labor relations specialist Karen Nevels asked Mr. Turner to resolve one issue in his first EEO complaint in order to keep that assignment.  When he refused, she reassigned him to the Bulk Mail Center to work as a custodian in a shift he did not desire, causing him a loss in pay.

On October 9, 2005, one of Mr. Turner's supervisors, Rhonda Albin, required him to clean the singulator[13] while it was moving.  Mr. Turner believed it to be dangerous and therefore submitted a form claiming a safety violation.  He gave the form to Mr. White, who angrily shoved the form back at Mr. Turner, and said that Mr. Turner could not give him the form because he

---

[12] There is evidence that Ms. Hulick received an inflated score.  Mr. DiNofrio testified in his deposition that he would not have given Ms. Hulick scores of 4 in some of the categories on her KSA .

[13] There is no evidence in the record as to what a singulator is.

had not witnessed the incident. The next day, Ms. Albin and Mr. White "nervously" followed Mr. Turner around.[14]

On November 15, 2005, Mr. Turner filed a second EEO complaint alleging discrimination. He claimed that beginning on October 10, 2005, he was subjected to harassment when he was not given a PAR sheet so that he could request a particular shift assignment, forced to change his shift assignment, was followed, was addressed aggressively and shoved, was yelled at, and was ostracized and intimidated by management. The precise factual basis of such claim was not stated in the EEO complaint.

In September 2006, Mr. Turner was given another MOS clerk job, and was promoted to Grade 6 in November of that year.[15]

The dates for several incidents alleged by Mr. Turner are not clear from the record. In one incident, Mr. Turner asked Mr. White for a safety harness to prevent him from falling while working up high. He made the request because his knee sometimes "gives out." Mr. White denied the request for a safety harness. In another incident, Mr. White "bumped" Mr. Turner into the time clock, and Mr. White and two others "were circling around [him] on the floor" and were "staged" around him. Mr. Turner also complains that Mr. White and Joe Ashton[16] followed the veteran employees around and threatened to impose discipline.[17] Mr. Turner also complains that

---

[14] It was Mr. Turner's perception that they were nervous, but there was no additional evidence offered to explain such perception, nor was precise evidence offered of how he was followed around.

[15] Evidence in the record suggests that this promotion may have occurred as early as July 22, 2006.

[16] The record shows that Joe Ashton was a supervisor, but it is not clear from the record what his relationship to Mr. Turner was.

[17] There is no evidence as to what the threats were, or to whom the threats were made.

Mr. White stared at him and watched everything he did.

At some point in time, which is not clear from the record, Mr. Turner attended mosque services during his lunch hour. On a date which is also not clear from the record, he asked the Postal Service's union president for permission to use personal leave in the event he returned late from a Friday prayer service. At first, his request was denied by the plant manager, Joe Williams, but it was later approved. On a date that is also not clear from the record, Mr. Turner stopped attending the mosque because he feared retaliation. Currently, he does not attend the mosque because it is too far away.[18]

## IV. Standard of Review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter

---

[18]In February 2006, Mr. DiNofrio told Mr. Turner's supervisor that Mr. Turner was not allowed the use the quiet room. This was a room Mr. Turner had used for prayers. Other employees were allowed to use the room. Mr. Turner states, however, that denial of use of the quiet room is not the basis for his claims, and he instead offers evidence of the same solely as background for his other claims.

for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence.  *See* Fed. R. Civ. P. 56(e).  Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material fact, no trial is required.  The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove.  If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## V.  Analysis

The Postal Service contends that Mr. Turner can present no direct evidence of discrimination, and therefore, the shifting-burden analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to all of Mr. Turner's claims.  Mr. Turner responds that there is direct evidence of discrimination, therefore the burden-shifting analysis does not apply.

11

To be "direct evidence" of discrimination, the evidence must, if believed, prove the existence of a fact in issue without any inference or presumption. *See Hall v. U.S. Dept. of Labor, Admin. Review Bd.,* 476 F.3d 847, 854 (10th Cir.), *cert. denied*, 128 S. Ct. 489 (2007). In other words, the evidence must, on its face, demonstrate that there was a discriminatory reason for an employment decision. *See Riggs v. AirTran Airways, Inc.,* 497 F.3d 1108, 1117 (10th Cir. 2007). If evidence can be interpreted as either discriminatory or benign, then it cannot constitute direct evidence of discrimination. *See Hall,* 476 F.3d at 855. Even a statement of personal opinion cannot constitute direct evidence of discrimination, because the factfinder must infer discriminatory intent from the statement. *Id.*

The Court finds no direct evidence of discrimination. Mr. Turner has not identified any evidence which unequivocally shows that any employment decision was made because of his disability, race or religion. Rather, he has pointed only to circumstantial evidence of discrimination, for instance, evidence of animus on the part of Mr. White with regard to disabled, black employees. Therefore, the shifting-burden analysis of *McDonnell Douglas* governs.

Under *McDonnell Douglas,* once the plaintiff demonstrates a *prima facie* claim of discrimination, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the adverse employment action. *See Montes v. Vail Clinic, Inc.,* 497 F.3d 1160, 1172-73 (10th Cir. 2007). If the defendant does so, then the burden shifts back to the plaintiff to present evidence that the reason offered by the defendant is pretextual. *See id.*

## A. Disparate Treatment

Mr. Turner claims disparate treatment in that he was denied a promotion and denied training opportunities. To establish a *prima facie* claim of disparate treatment, Mr. Turner must

produce sufficient competent evidence that: (1) he is disabled, black, or Muslim; (2) he was subjected to an adverse employment action; and (3) similarly situated employees were treated differently. *See Orr v. City Of Albuquerque,* 417 F.3d 1144, 1149 (10th Cir. 2005).

The Postal Service asserts that Mr. Turner cannot present sufficient evidence for a *prima facie* showing on element 1 (as to disability, only) or element 2. It does not assert that Mr. Turner cannot present sufficient evidence as to element 3.

To the extent that Mr. Turner claims discrimination based upon a disability, his claim is asserted under the Rehabilitation Act. An individual is "disabled" for purposes of the Rehabilitation Act when he

> (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities;
> (ii) has a record of such an impairment; or
> (iii) is regarded as having such an impairment.

29 U.S.C. § 705(20)(B).

To prove disability status, an individual cannot rely only upon evidence of a medical diagnosis of an impairment. *See Robertson v. Las Animas County Sheriff's Dept.,* 500 F.3d 1185, 1194 (10th Cir. 2007). Instead, the individual must offer evidence which demonstrates a substantial limitation on a major life activity. *Id.* When an individual is not rendered completely unable to perform tasks, then determination of whether an impairment substantially limits a major life activity depends upon whether there is a significant restriction as to the condition, manner, or duration of the individual's ability to perform the activity when compared with the ability of an average person in the general population. *See id.* A court should consider: "(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the

permanent long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Pack v. Kmart Corp.,* 166 F.3d 1300, 1305 (10th Cir.1999). A court should also consider any mitigating or corrective measures which the individual has used to deal with the impairment. *Id.* at 1306. A major life activity is one which is of central importance to daily life, such as hearing, walking, seeing, *see Robertson,* 500 F.3d at 1194 (citing cases); sleeping, caring for oneself, working, sitting, standing, lifting, and reaching, *see Pack,* 166 F.3d at 1305. *See also* 45 C.F.R. § 84.3.

Here, Mr. Turner has produced evidence that his medically-diagnosed shoulder and knee injuries cause him pain and substantially interfere with his ability to sleep. He reported that he can sleep only 2 hours at a time and awakens several times per night "due to pain, restlessness and stress." If admitted at trial, this evidence would constitute a *prima facie* showing of a disability. Therefore, the Court does not need to address Mr. Turner's alternative contentions that he has a record of a disability or is regarded as disabled. It is also unrefuted that Mr. Turner is African-American and Muslim. Therefore, he has made a *prima facie* showing as to element 1.

He also has made a *prima facie* showing as to element 2. With regard to this element, Mr. Turner relies upon two categories of adverse employment actions, and has offered evidence in support of each: (1) the failure to promote him to MOS clerk jobs in October 2004 and March 2005; and (2) the failure to train him on driving equipment, resulting in his inability to obtain higher pay while he worked as a custodian.

A *prima facie* showing having been made, the Court first notes that the Postal Service has offered no explanation for the failure to promote Mr. Turner in October 2004 and March 2005,

nor for the failure to train Mr. Turner at any time apart from November 12, 2004. Thus, a trial is required on these two claims of disparate treatment.

The Court turns to whether Mr. Turner has sufficient evidence of pretext in response to the Postal Service's alleged nondiscriminatory reason for not providing him requested training on November 12, 2004. The Postal Service contends that no training was scheduled for that date and that Mr. Turner had already received the training he needed.

Thus, the burden shifts to Mr. Turner to offer evidence that this proffered reason is pretextual. He has presented evidence that he was scheduled for training on November 12, 2004, but that it was cancelled by an individual named Bob Padilla for staffing reasons. On the face of this statement there is no inconsistency that evidences pretext, because the training could have been scheduled and then cancelled. Mr. Turner's remaining evidence also does not establish pretext. Even if Mr. White had an animus against disabled, black employees, Mr. White was not his supervisor during November 2004 and there is no evidence that Mr. White influenced decisions affecting Mr. Turner after ceasing to be his supervisor.

Mr. Turner presented no evidence of pretext for denying him the training on November 12, 2004. Thus, to the extent his claim is premised upon the denial of training on that particular date, the claim is dismissed. In all other respects, a trial is required on the disparate treatment claim.

## B. Retaliation

Mr. Turner alleges that the Postal Service retaliated against him because he represented an African-American disabled veteran, Ezekiel Williams, with EEO activity during the summer of 2004, and because he submitted his own EEO complaints in January and November 2005. He

claims that the Postal Service retaliated against him in two ways – by failing to promote him in October 2004 and March 2005, and by reassigning him from the General Mail Facility to the Bulk Mail Facility during the summer of 2005.

To establish a *prima facie* claim of retaliation, Mr. Turner must produce sufficient competent evidence that: (1) he engaged in protected conduct; (2) a reasonable employee would have found that he was subjected to a materially adverse employment action; and (3) there is a causal connection between the protected conduct and the adverse action. *See Proctor v. United Parcel Service,* 502 F.3d 1200, 1208 (10th Cir. 2007). With regard to element 3, a *prima facie* showing is made where the adverse action follows shortly after the protected activity. *See Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir. 1999). As with other claims of discrimination, the *McDonnell Douglas* burden shifting analysis applies. *See id.* at 1178.

The Postal Service does not challenge Mr. Turner's ability to produce evidence in support of elements 1 or 2.[19] Instead, the Postal Service asserts that Mr. Turner cannot produce sufficient evidence to support element 3.

As to one of the alleged adverse employment actions, there is evidence of a causal connection between the adverse action and a protected activity. Mr. Turner submitted his first EEO complaint in January 2005. While it was pending, he worked as an acting supervisor at the General Mail Facility. He has offered evidence that labor relations specialist Karen Nevels asked Mr. Turner to resolve one issue in his EEO complaint in order to keep that assignment. When he

---

[19] The Postal Service appears to concede that Mr. Turner's two EEO complaints and "representation" of Ezekiel Williams constituted protected conduct. It also appears to concede that the denial of the two promotions to MOS clerk jobs, and the reassignment from his acting supervisor position, satisfy element 2 of a retaliation claim.

refused, he was reassigned to the Bulk Mail Center to work as a custodian at a diminished rate of pay and on an undesirable shift. Thus, a trial is required on this claim of retaliation.

As to the other two alleged adverse employment actions, Mr. Turner asserts causation only by temporal connection.

Mr. Turner represented Ezekiel Williams with an EEO complaint until August 2004. Less than two months thereafter, although eligible, Mr. Turner was not offered the MOS clerk job. Had the job been posted when it became vacant in October 2004, Mr. Turner would have been selected for the job because his name was the only name on the eligibility list. However, the job was withheld and not posted until after other higher-ranked names appeared on the eligibility list. In light of the close temporal proximity between the alleged protected activity and adverse action, and the other attendant facts just described, the Court finds that Mr. Turner has produced sufficient evidence to require a trial on this alleged retaliation.

As to Mr. Turner's first EEO complaint filed in January 2005, there is a close temporal connection with his failure to be selected for the MOS clerk job which was posted in either March or April 2005. The vacancy arose while his EEO complaint was pending, and Mr. Turner has presented evidence that the job was instead offered to Ms. Reddix, who had neither completed a KSA form nor was listed on the eligibility list. Again, in light of the proximity between the alleged protected activity and adverse action, and the other attendant facts described here, Mr. Turner has produced sufficient evidence to require a trial on this retaliation claim, as well.

However, Mr. Turner has offered no evidence that he was subjected to an adverse employment action because he submitted the November 2005 EEO complaint. Thus, he is limited to asserting three retaliation claims: (1) denial of the October 2004 promotion as retaliation for his

representation Ezekiel Williams; (2) denial of the March/April 2005 promotion as retaliation for submitting the first EEO complaint in January 2005; and (3) reassignment from the acting supervisor job at the General Mail Facility as retaliation for submitting the first EEO complaint.

The Postal Service does not challenge Mr. Turner's ability to offer evidence of pretext. Therefore, a trial is required on Mr. Turner's retaliation claims, as delineated above.

**C. Hostile Work Environment**

Mr. Turner alleges that he was subjected to a hostile work environment because of his disability, race, and religion. To establish a *prima facie* claim of a hostile work environment, Mr. Turner must produce sufficient competent evidence that: (1) he is disabled, black, or Muslim; (2) he was subjected to unwelcome harassment; (3) the harassment was based upon his disability, race or religion; (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of Mr. Turner's employment and created an abusive working environment. *See Dick v. Phone Directories Co., Inc.,* 397 F.3d 1256, 1263 (10th Cir. 2005).

As for element 4, the work environment must be both objectively and subjectively hostile. *See Smith v. Northwest Financial Acceptance, Inc.,* 129 F.3d 1408, 1413 (10th Cir. 1997). In other words, there must be evidence that: (1) a reasonable person would find the work environment was hostile or abusive; and (2) the plaintiff must subjectively perceive the environment to be abusive. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993).

To determine whether a work environment is objectively hostile or abusive, a court looks at the totality of the circumstances and considers the frequency, severity and context of discriminatory conduct, whether there was a threat of physical harm, whether the conduct resulted in humiliation, whether there were merely offensive statements, and whether the conduct

unreasonably interfered with an employee's work performance. *Smith*, 129 F.3d at 1413. A plaintiff must do more than demonstrate a few isolated incidents of enmity or sporadic slurs. *See Herrera v. Lufkin Industries, Inc.,* 474 F.3d 675, 680 (10th Cir. 2007). Instead, there must be a steady barrage of such incidents. *See id.*

The Postal Service asserts that Mr. Turner cannot produce evidence to support elements 1 (as to disability), 2, 3 (as to disability), or 4 of a *prima facie* claim.

As discussed *supra*, Mr. Turner has produced evidence of a disability. Thus, he has made a *prima facie* showing as to element 1.

Mr. Turner also has made a *prima facie* showing as to element 2. His evidence shows that Mr. White told Mr. Turner "that he wanted to fire all disabled veterans," most of whom were African-American, that Mr. White said that if he had it his way, he would fire all of the disabled veterans and hire cheap labor, and that Mr. White called Mr. Turner a trouble maker due to his race. He also presented evidence that Mr. White "bumped" him into the time clock, and angrily shoved paperwork back at him when he attempted to report what he perceived to be a safety violation. Mr. Turner also presented evidence that Mr. White and Mr. Ashton followed him around and threatened to impose discipline.[20]

As for element 3, Mr. Turner has offered evidence that the harassment was motivated by his race and disability. This is evident from the content of the comments purportedly made by Mr. White. However, as to Mr. Turner's religion, he has offered no evidence that his religion was the

---

[20] Mr. Turner's evidence also shows repeated comments made by Mr. White to others regarding disabled veterans. However, there is no evidence whether the comments made by Mr. White to others apart from Mr. Turner were known to Mr. Turner while he was supervised by Mr. White, or whether he simply learned of the statements later, perhaps in conjunction with his lawsuit. Thus, such comments to others do not demonstrate that Mr. Turner was subjected to harassment.

motivation for any harassment.

However, Mr. Turner has not offered evidence with regard to element 4. Although he has presented evidence of discrete instances in which he was subjected to harassing conduct by Mr. White, the evidence does not demonstrate any connection between those instances. Of all the comments which Mr. Turner either heard or knew about, only one occurred during the probationary period in the summer of 2004 when Mr. White was his supervisor. The rest of the comments occurred on dates which cannot be determined from the record. As for Mr. White's comments expressing a desire to fire the disabled veteran employees, he lacked the authority to make firing decisions. As for the remaining incidents involving Mr. White, most occurred on dates which cannot be discerned from the record. The only incident for which there is evidence of a specific date is the October 2005 incident involving the safety violation paperwork. This occurred more than one year after Mr. White ceased being Mr. Turner's supervisor. There is no evidence that Mr. Turner felt humiliated by Mr. White or that Mr. Turner's work performance was negatively affected by White's conduct, either during or after the probationary period. Quite to the contrary, Mr. Turner was retained by the Postal Service after his probationary period and eventually promoted. Thus, the evidence offered by Mr. Turner does not objectively demonstrate that he was subjected to harassment that was so severe as to alter a term, condition, or privilege of his employment. The Court is therefore compelled to dismiss the hostile work environment claim.

**D.  Failure to Accommodate a Disability**

Mr. Turner alleges that the Postal Service failed to accommodate his disability because it refused to provide him with a safety harness to use while climbing, and because it denied him

training on the riding equipment. To establish a *prima facie* claim of discrimination based upon a failure to accommodate a disability, Mr. Turner must produce sufficient competent evidence that: (1) he was disabled; (2) he was qualified, with or without reasonable accommodation, to perform the essential functions of the job he held or desired; and (3) the Postal Service failed to make reasonable accommodations to his known physical or mental limitations. *See Davidson v. America Online, Inc.*, 337 F.3d 1179, 1188 (10th Cir. 2003). The Postal Service contends that Mr. Turner cannot produce evidence to support any element of this claim.

As discussed *supra*, Mr. Turner has presented evidence that he was disabled. In addition, he has presented evidence that he was qualified to work as a custodian, and indeed, remained in that job even though he continually sought a promotion. He also has presented evidence that he asked Mr. White to provide him a safety harness because his knee might not support him while climbing at the postal facility, and Mr. White refused such request.[21] Thus, he presented evidence that at least Mr. White knew he had a knee injury which required some accommodation.

The Postal Service has offered no legitimate, nondiscriminatory reason for the refusal to provide the safety harness. However, in its reply, the Postal Service contends that Mr. Turner failed to exhaust this claim. The Court observes that, based upon the two EEO complaints in the record, it does not appear that this claim was exhausted. However, because this jurisdictional issue was raised for the first time in a reply, Mr. Turner had no opportunity to respond to it. Therefore, the Court reserves determination as to whether it has jurisdiction over this claim, and will give Mr. Turner 15 days to file a brief addressing such issue.

---

[21] By contrast, he offered no evidence that he sought training on the riding equipment to accommodate his disability, but this is not dispositive.

### E.  Failure to Accommodate Religion

Mr. Turner alleges that the Postal Service refused to accommodate his religious beliefs by refusing to let him attend mosque on his lunch hour.  To establish a *prima facie* claim of discrimination based upon a failure to accommodate a religious belief, Mr. Turner must produce sufficient competent evidence that: (1) he had a bona fide religious belief that conflicts with an employment requirement; (2) he informed his employer of this belief; and (3) his employer subjected him to an adverse employment action for his failure to comply with the conflicting employment requirement.  *See Thomas v. National Ass'n of Letter Carriers,* 225 F.3d 1149, 1155 (10th Cir. 2000).  The Postal Service contends that Mr. Turner cannot produce evidence to support element 3.

Mr. Turner has presented evidence that he is Muslim and would like to attend mosque during his lunch hour but fears retaliation if he does so.  However, he has also presented evidence that he has been given permission to attend mosque and, if he is late returning to work, he can use annual leave.  Thus, there is no evidence that the Postal Service has not accommodated his religious beliefs, nor that it took any adverse action against him for attending mosque.  Any fear of retaliation that Mr. Turner has is insufficient to demonstrate an adverse employment action.  Therefore, the Court is compelled to dismiss the religious accommodation claim.

**IT IS THEREFORE ORDERED** that:

(1)     The Motion for Summary Judgment **(#22)** is **GRANTED** in part and **DENIED** in part.

(2)     Mr. Turner's hostile work environment claim, and his claim that the Postal Service failed to accommodate his religious beliefs, are **DISMISSED**.

(3)     The claims which remain are:

    **Claim 1:**    The Postal Service failed to promote Mr. Turner, and failed to provide him with training opportunities on a date other than November 12, 2004, because he is disabled, African-American, and/or Muslim.

    **Claim 2:**    The Postal Service retaliated against Mr. Turner because he assisted another individual with an EEO complaint, and because he filed EEO complaints of his own in January 2005. The retaliation consisted of: (a) the failure to promote Mr. Turner in October 2004 and March 2005; and (b) the termination of Mr. Turner's temporary assignment as acting supervisor at the General Mail Facility and his concomitant reassignment to the Bulk Mail Facility during the summer of 2005.

    **Claim 3:**    The Postal Service failed to accommodate Mr. Turner's disability by denying his request for provision of a safety harness, and denying him training on the riding equipment.

(4)     Within 15 days of this Order, Mr. Turner shall file a brief addressing whether the

Court has subject matter jurisdiction over Claim 3.

Dated this 15th day of January, 2008

                              **BY THE COURT:**

                              _____

                              Marcia S. Krieger
                              United States District Judge